## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

ALBERT F. CATANACH, JR.,

       Plaintiff,

v.                                No. Civ. 06-1115 LH/RHS

CITI CARDS/BANK,[1]

       Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on "Motion of Defendant Citibank (South Dakota),

N.A., Erroneously Identified as 'Citi Cards/Bank', for Summary Judgment" (Doc. 13, filed June 11,

2007); on Plaintiff's Motion for Summary Judgment (Doc. 19, filed June 18, 2007); and on

Defendant's Motion to Amend Answer (Doc. 38, filed Oct. 6, 2007).  The Court, having reviewed

the motions, briefs, relevant law, and otherwise being fully advised, finds that the motions should

be denied.

## I.  FACTUAL BACKGROUND[2]

       Plaintiff Albert F. Catanach, Jr., ("Plaintiff") maintains a consumer credit card account (the

---

[1] It appears that Plaintiff has erroneously identified Citi Cards/Bank as the defendant in this action.  Citibank (South Dakota), N.A., has appeared as a defendant instead, and plaintiff has never contested that Citibank (South Dakota), N.A., is the correct party.

[2] Although Plaintiff asserts generally that he disputes the material facts listed in ¶¶ 2 and 4-9 of Defendant's motion for summary judgment, Plaintiff does not articulate his reasons nor provide admissible evidence for disputing many of Defendant's facts.  The following facts are taken from the material facts set forth in the parties' cross motions for summary judgment, the parties' briefs responding to each others' undisputed material facts, and the exhibits attached to the parties' motions and other briefs.  Where the facts are disputed with evidentiary support, the Court views them in the light most favorable to the nonmoving party for the purposes of ruling on the moving party's motion for summary judgment.

"Account") in Plaintiff's name with Defendant Citibank (South Dakota), N.A. ("Defendant" or "Citibank").  *See* Decl. of Elizabeth S. Barnette (Doc. 14) ("Barnette Decl."), ¶ 3.  The Account lists Plaintiff's address as 103 W. Barcelona Rd., Santa Fe, NM, 87505-0661.  *See* Pl.'s Reply to Def.'s Mot. for Summ. J. (Doc. 18) ("Pl.'s Resp."), Ex. 1.

CNSP, Inc., is an internet service provider and a New Mexico corporation with a principal address of 1308 Apache Ave., Santa Fe., NM, 87505.  *See* Barnette Decl., ¶ 5; Pl.'s Resp., Ex. 8. Plaintiff acted as president of CNSP, Inc., until October 2006, when he resigned his position due to disabilities arising from his military service.  *See* Pl.'s Resp., Ex. 8.

On January 30, 2006, a charge in the amount of $5,074.34 for DRMS-Government Liquidation ("DRMS") posted to Plaintiff's Account.  Def.'s Mot. for Summ. J. (Doc. 13) ("Def.'s MSJ"), Undisputed Fact ("UF") ¶ 1.  This charge showed up on Plaintiff's statement with a closing date of February 14, 2006.  *Se*e Pl.'s Mot. for Summ. J. (Doc. 19) ("Pl.'s MSJ"), Ex. 1.  In February 2006, DRMS shipped computer goods to CNSP, Inc.'s address, but Plaintiff, due to his disability, was unable to personally inspect the goods.  *See* Pl.'s Resp., Ex. 3.  Instead, CNSP technicians inspected the goods and found that the computer cases had a significant amount of damage and approximately 75% of the items were missing RAM, CPU processors, and/or CD drives.  *See id.*; Pl.'s MSJ, Ex. 5.  In a letter dated March 1, 2006, Plaintiff informed Defendant that he was disputing the $5,074 charge.  *See* Pl.'s Resp., Ex. 5.[3]  In describing his reasons for disputing the charge, Plaintiff stated: "I purchased computers and computer parts.  The listing that I bid and won stated

_____

[3]In the March 1, 2006 letter, Plaintiff states that the letter is in response to a February 27, 2006 letter from Citibank and answers questions posed by Citibank in that letter.  *See* Pl.'s Resp., Ex. 5.  It thus appears that Plaintiff may have discussed the $5,074 charge with Citibank earlier, but it is unclear from the record how, what, and when Plaintiff first communicated to Citibank concerning the charge.

that the only item missing from the computers were hard drives.  After receiving the product, there were many items missing to include RAM, CD Drives."  *Id.*

On or about February 27, 2006, a charge in the amount of $4,053.50 for DRMS posted to Plaintiff's Account.  Def.'s MSJ, UF ¶ 3; Pl.'s Resp., Ex. 1.  This charge showed up on Plaintiff's statement with a closing date of March 16, 2006.  *See* Pl.'s MSJ, Ex. 1.  In March 2006, DRMS shipped goods relating to this charge to 1308 Apache Ave., but Plaintiff, due to his disability, was unable to personally inspect the goods.  *See* Pl.'s Resp., Ex. 3.  Instead, CNSP technicians inspected the goods and again found items missing, including 10 Micron computers.  *See id.*; Pl.'s MSJ, Ex. 5.  By letter dated March 26, 2006, Plaintiff notified Citibank that he was disputing the $4,053.50 charge.  *See* Pl.'s Resp., Ex. 5.[4]  In describing his reasons for disputing this charge, Plaintiff stated: "I purchased 31 dell and micron computers.  I only received 21 dell computers and no micron computers.  After receiving the 21 computers, there were many items missing to include Ram, CD Drives. . . . Per the listing, the only item that should be missing is the hard drives."  *Id.*

In February and March 2006, Plaintiff also attempted to resolve his issue with the missing items with DRMS.  *See* Pl.'s Resp., Ex. 4.  DRMS indicated that it would not give a refund.  *See id.* The invoices relating to the two charges list DRMS as being located in Scottsdale, Arizona.  *See* Barnette Decl., Ex. A & B.

On March 27, 2006, Citibank received correspondence regarding the two charges.  *See id.*, ¶¶ 8-9.  Plaintiff provided Defendant with a copy of DRMS invoices pertaining to the $5,074.34 and

_____

[4]Again, based on the contents of the March 26, 2006 letter, it appears that Plaintiff was responding to a March 17, 2006 letter from Citibank.  *See* Pl.'s MSJ, Ex. 5.  It thus appears that Plaintiff may have communicated to Citibank that he was disputing the $4,053.30 charge earlier, but it is unclear from the record how and what was communicated.

$4,053.50 charges, both of which indicate that the various computer goods were "Sold To: CNSP, Inc." at the 1308 Apache Ave. address in Santa Fe. *Id.* ¶¶ 3-4, 6-7 & Ex. A & B.  Each invoice also states under "Conditions of Sale" that "[t]he purchaser acknowledges that each article purchased was examined and inspected prior to purchase or that the buyer has waived their opportunity to inspect the property."  *See id.*, Ex. A & B.  The invoices, however, do not contain Plaintiff's signature.  *See id.*  Plaintiff also provided Defendant with email correspondence in which he describes to DRMS the problem he had with the goods:

> We purchased these items (computers) under the impression that hard drives were the only items missing from the computers. . . . My complaint is that our technicians are reporting that at least half of the computers do not have any ram installed in the computer.  Some of the computers do have the ram, but do not have the original amount of ram as reported by the manufacture[] when purchased by the Government. . . .  Please let me know what you can do about these computers missing RAM.  I would like to note that the description says that the only item missing is the hard drive, so these items are not what the descriptions says [sic] they are!

*Id.*, Ex. C at 3.  The email is signed "Albert Catanach, CNSP, Inc."  *Id.*

On April 13, 2006, in response to an inquiry by Citibank, Plaintiff confirmed in writing that he was disputing $1,820 of the $5,074.34 charge.  *See id.*, Ex. D.  Plaintiff argues, however, that he agreed to the $1,820 amount because this was the amount necessary to bring the computers to a usable state.  *See* Pl.'s Resp., ¶ 6.  Plaintiff contends that, because DRMS refused to bring the computers to a usable state, he had to return the computers, and consequently, disputes the entire amount.  *See id.*

In April 2006, Citibank contacted DRMS's bank to dispute the $4,053.50 charge and the $1,820 portion of the $5,074.34 charge.  Barnette Decl., ¶ 10.  By letter dated May 4, 2006, DRMS's bank responded on behalf of DRMS and refused to issue a credit regarding the $5,074.34 charge.

4

*See id.*, ¶ 10 & Ex. E.  Citibank informed Plaintiff by letter dated July 12, 2006, that it had reviewed the dispute information regarding the $5,074.34 charge and had determined that it had "no recourse to further dispute the charge."  Pl.'s Resp., Ex. 5 at 5.  Citibank further explained its reasons to Plaintiff:

> The contract provided by the merchant states the information and description in the advertising is deemed reliable but not guaranteed.  The merchant has refused our request for credit of this charge and we have no options to require them to issue a credit.  You will need to seek other means to resolve this matter.

*Id.*

As for the $4,053.50 charge, by letter dated May 4, 2006, DRMS's bank responded on behalf of DRMS and refused to issue a credit regarding the charge.  *See* Barnette Decl., ¶ 10 & Ex. F.  Citibank, by letter dated June 13, 2006, informed Plaintiff of DRMS's response and that he needed to return the products to DRMS and provide a reply to DRMS's comments.  *See* Pl.'s Resp., Ex. 6.  Plaintiff informed Citibank by letter dated June 28, 2006, that, per Citibank's request, he had shipped to DRMS the merchandise related to that charge.  *See* Barnette Decl., Ex. G.  DRMS, however, refused the shipment.  *See* Def.'s MSJ ¶ 9; Pl.'s Resp. ¶ 9.  By letter to Citibank dated July 18, 2006, DRMS's bank refused to issue a credit for the $4,053.50 charge.  *See* Barnette Decl., ¶ 10 & Ex. F.  Citibank, by letter dated August 21, 2006, informed Plaintiff that it had reviewed the dispute regarding the $4,053.50 charge and "ruled in favor of the merchant."  Pl.'s Resp., Ex. 5 at 6.  It gave as its reasons that Plaintiff "failed to provide documentation proving that you tendered return of the merchandise."  *Id.*  Citibank also informed Plaintiff that, although it had previously issued a conditional credit in the amount of $4,053.50 pending the outcome of its investigation, it had rebilled the Account.  *Id.*

On or about September 16, 2006, Defendant credited $50.00 to Plaintiff's Account.  *See*

5

Barnette Decl., Ex. H.  Plaintiff currently has the goods in storage.  Pl.'s Resp., ¶ 10.

## II.  PROCEDURAL BACKGROUND

Plaintiff filed a Civil Complaint in Santa Fe County Magistrate Court asserting claims "under the Fair Credit Billing Act" regarding the $5,074 and $4,053 charges.  The complaint alleges that Plaintiff told Defendant that both transactions had either damaged or missing goods and were not delivered as agreed.  Plaintiff asserted the following claims under the Fair Credit Billing Act ("FCBA"): (a) Defendant failed to credit Plaintiff's Account due to charges for goods Plaintiff did not accept or were not delivered as agreed; (b) Defendant did not resolve the disputes within two billing cycles and well over the 90-day requirement of the FCBA; and (c) Defendant failed to follow the settlement procedure such that it "may not collect the amount in dispute, or any related finance charges, up to $50, even if the bill turns out to be correct" and refused to post credits to the Account for returned goods.  *See* Compl. at 2.  Plaintiff requested damages "in the amount of $9,900." *Id.* Defendant timely removed the case to this Court and the parties have filed competing motions for summary judgment.  On October 6, 2007, Defendant moved to amend its answer to assert a counterclaim for breach of contract and money lent.

## III.  STANDARD

Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted).  Under Rule

56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Id.* at 248.

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.*; *Kaus v. Standard Ins. Co.*, 985 F.Supp. 1277, 1281 (D. Kan. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See Anderson*, 477 U.S. at 248.

## IV.   ANALYSIS

The Truth in Lending Act ("TILA") is a remedial act intended to protect consumers. *See* 15 U.S.C. § 1601(a); *Gallegos v. Stokes*, 593 F.2d 372, 376 (10th Cir. 1979); *Belmont v. Assoc. Nat'l Bank (Delaware)*, 119 F.Supp.2d 149, 159 (E.D.N.Y. 2000). As such, its provisions must be construed liberally in favor of consumers. *See Gallegos*, 593 F.2d at 376; *Belmont*, 119 F.Supp.2d at 159 (citing *Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 707 (11th Cir. 1998)). Because of the remedial nature of the statute, once a court finds a violation of TILA "no matter how technical it has no discretion with respect to the imposition of liability." *Kurz v. Chase Manhattan Bank*, 273 F.Supp.2d 474, 478 (S.D.N.Y. 2003) (quoting *Grant v. Imperial Motors*, 539 F.2d 506,

510 (5th Cir. 1976)).

The Federal Reserve Board, pursuant to the expansive powers granted to it by Congress in implementing the TILA, has issued governing regulations, 12 C.F.R. § 226.1, *et seq.*, commonly referred to as Regulation Z. *Greisz v. Household Bank (Illinois)*, 8 F.Supp.2d 1031, 1036 (N.D. Ill. 1998). The Federal Reserve Board's official staff opinions construing the TILA and Regulation Z are binding unless demonstrably irrational. *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980); *Greisz*, 8 F.Supp.2d at 1036.

The FCBA added a number of provisions to the TILA regarding a creditor's obligations when an obligor properly notifies it of a billing error. *See* 15 U.S.C. § 1666, *et seq.* Within 30 days after receipt of the obligor's notice, the creditor must send a written acknowledgment that it received the notice, and within 90 days or two complete billing cycles, whichever is shorter, the creditor must investigate the alleged error and either correct the error or send a written explanation or clarification to the obligor of its belief that the original statement sent to the obligor was correct. *See id.*; *American Express Co. v. Koerner*, 452 U.S. 233, 235 (1981); 12 C.F.R. § 226.13.

## A.      Defendant's Motion for Summary Judgment

Defendant asserts three reasons why it is entitled to summary judgment on Plaintiff's FCBA claims: (1) Plaintiff cannot show that the disputed credit card transactions were made for consumer purposes; (2) Plaintiff's dispute does not qualify as a "billing error;" and (3) even if the FCBA applies and Defendant failed to comply with the FCBA's timing provisions, the claim is moot because Defendant has already credited $50.00 to Plaintiff's Account, the maximum amount required to be forfeited under the statute.

## 1.      Consumer Purpose

The TILA does not apply to "[c]redit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes." 15 U.S.C. § 1603(1). A court must examine the transaction as a whole and the purpose for which the credit was extended in order to determine whether the transaction was primarily consumer or commercial in nature. *See Gallegos*, 593 F.2d at 375; *Tower v. Moss*, 625 F.2d 1161, 1166 (5th Cir. 1980).

The FCBA also states that § 1666(a) only applies "whenever a creditor transmits to an obligor 'a statement of the obligor's account in connection with an extension of consumer credit.'" *Koerner*, 452 U.S. at 234-35 (quoting 15 U.S.C. § 1666(a)). The threshold inquiry under the FCBA is therefore whether there has been an extension of consumer credit. *See id.* at 240. If there has been no extension of "consumer credit," 15 U.S.C. § 1666(a) imposes no obligation upon a creditor. *Id.* Two elements "must be present in every 'consumer credit' transaction: the party to whom the credit is extended must be a natural person, *and* the money, property, or services received by that person must be 'primarily for personal, family, household, or agricultural purposes.'" *Id.* at 241 (quoting 15 U.S.C. § 1602(h)).[5]

In this case, Plaintiff has provided evidence indicating that he can meet the first element for a "consumer credit" transaction. Plaintiff provided an account statement that is in his personal name and lists his personal address. This evidence demonstrates that the party to whom the credit is extended is a natural person.

The second element, however, is more problematic in this case, because it requires resolution of which "transaction" must be primarily for consumer purposes. In the credit card context, a

---

[5]Amendments to Regulation Z have since omitted "agricultural" purposes from the definition of "consumer credit." *See* 12 C.F.R. § 226.2(a)(12).

9

creditor extends "credit" when it opens or renews an account as well as when the cardholder actually uses the credit card to make purchases. *Koerner*, 452 U.S. at 241. Because there are two types of extensions of credit that occur in the credit card context, it is unclear which type is the relevant transaction for determining whether it is an "extension of consumer credit" – the creation or renewal of the credit card account, the use of the credit card to make the particular purchase, or both. *See id.* at 241-42. The Supreme Court in *Koerner* explained the issue:

> The language of § 161(a) does not distinguish between the two types of transactions included in the definition of "credit" or indicate which of them must satisfy the definition of "consumer" in order for the section to be applicable. There are several possibilities. The relevant extension of credit may be only the creation or renewal of the account. Under this view, . . . if an account is opened by a natural person, its overall purpose must be considered. If the account is opened primarily for consumer purposes, § 161(a) applies, even if the cardholder uses the card for an occasional nonconsumer purchase. On the other hand, the language might be interpreted to call for a transaction-by-transaction approach. With such an approach, § 161 would apply if the transaction that is the subject of the dispute is a consumer credit transaction, regardless of the overall purpose of the account. A third alternative would be to combine the two approaches by holding § 161 applicable to all disputes that arise under an account that is characterized as a consumer credit account as well as to any dispute concerning an individual transaction that is an extension of consumer credit, even if the overall purpose of the account is primarily a business one.

*Id.* at 242.[6] The Supreme Court, however, did not ultimately resolve the issue of which approach is correct, because the respondent in *Koerner* was unable to succeed under any of the three approaches. *See id.* at 242-43.[7] The Supreme Court did note, however, that it is "clear that some consideration of the overall purposes of a credit card account, not merely of individual transactions,

---

[6]Section 161 of the TILA is codified in 15 U.S.C. § 1666. *See* 15 U.S.C. § 1666; *Koerner*, 452 U.S. at 234 & n.1.

[7]Because of its holding, the Supreme Court in *Koerner* also avoided the issue of the applicability of the exemption for credit extended for business or commercial purposes contained in 15 U.S.C. § 1603(1). *See Koerner*, 452 U.S. at 240 n.7.

is necessary under § 161" because some of the billing errors described in the FCBA (such as charges of extensions of credit that were never made and errors in computation) do not arise from a particular use of a credit card and are possible only when the credit card account itself is classified as an extension of consumer credit.  *See id.* at 242 n.10.  The Supreme Court nevertheless expressed its hesitation to preclude completely the possibility of a transaction-by-transaction approach, because of language in Regulation Z, which has since been revised.  *See id.* at 243.

Regulation Z in its current form, however, indicates that the overall purpose of the credit card account is the relevant extension of credit.  The Official Staff Interpretations to Regulation Z note that, as to the definition of "consumer credit," there is no precise test for what constitutes credit offered primarily for personal, family, or household purposes and refers to "the discussion of business purposes in the commentary to § 226.3(a)."  12 C.F.R. part 226, Supp. I, comment 2(a)(12). The commentary to § 226.3 explains that examples of business-purpose credit include a "business account used occasionally for consumer purposes" and, conversely, examples of consumer-purpose credit include a "personal account used occasionally for business purposes."  *Id.*, comment 3(a).

Since *Koerner* was decided, few courts have addressed the issue of which of the three alternatives is the proper approach.  The Missouri Court of Appeals, however, had occasion to do so in *Citibank (South Dakota), N.A. v. Mincks*, 135 S.W.3d 545 (Mo. App. 2004).  In *Mincks*, the credit card holders opened a credit card account using an application for personal credit and there was nothing in the record indicating that most of the purchases charged to the account were for anything other than personal, family, or household purposes.  *See id.* at 549-50.  Nevertheless, the cardholders used the credit card to purchase 4,000 postcards for use in a home business.  *See id.* at 550.  The merchant never delivered the postcards, however, and after repeated attempts to resolve

the dispute with the merchant, the cardholders notified the creditor that the purchased goods had not been delivered and that they were invoking their rights under Regulation Z to have their account credited for the charged amount. *See id.* After the creditor sued for breach of contract to recover the charged amount, the cardholders asserted non-delivery of the merchandise as a defense under 15 U.S.C. § 1666i. *See id.* at 551. The creditor argued, however, that non-delivery could not be asserted as a defense because the transaction at issue was not within the scope of Regulation Z, given that the specific purchase was made for a business purpose. *See id.* at 552.

The Missouri Court of Appeals disagreed. *See id.* at 556. As relevant here, the court determined that the relevant transaction under 15 U.S.C. § 1666i was the initial extension of credit when the account was opened, rather than the specific postcard purchase, because that act resulted in the creation of an open end consumer credit plan. *See id.* at 555. The court determined that this result was entirely consistent with the *Koerner* opinion. *Id.* The *Mincks* court concluded that the first of the three alternatives listed in *Koerner*, which it termed "the overall purpose test," is the approach that should be used when an open end consumer credit plan is involved. *See id.* at 556. As the *Mincks* court explained, "If the account was opened primarily for consumer purposes, the statutory and regulatory framework of the [TILA] applies, even if the cardholder occasionally uses the card for a nonconsumer purchase." *Id.* The court found support for this conclusion in the Official Staff Interpretations of Regulation Z dealing with 12 C.F.R. 226.3. *See id.*

The Court finds the reasoning of the *Mincks* opinion persuasive and similarly concludes that the overall purpose test should be used in determining whether § 1666(a) and the § 1603(1) exemption applies. The overall purpose test is not only in keeping with the Official Staff Interpretations construing the business-purpose exemption but it also more adequately addresses the

12

fact that some billing errors do not arise from a particular use of the credit card.  This conclusion is also warranted because the statute must be construed liberally in favor of consumers.

Turning to the facts of this case, there are conflicting facts as to whether the Account was used generally for business or consumer purposes.  Although Plaintiff's Account statements did not provide the nature of the majority of purchases charged to the Account and the two charges at issue here seem to have been made for business purposes, the Account statements did show that the Account was in Plaintiff's personal name and home address.  Moreover, Elizabeth S. Barnette's Declaration refers to the Account as "a consumer credit card account."  Barnette Decl., ¶ 3.  The Court finds that this evidence is sufficient to create a genuine issue of material fact as to whether the Account's overall purpose was for consumer purposes, and thus, the Court cannot grant summary judgment on this ground.  *See Gallegos*, 593 F.2d at 375 (noting that whether consumer's purchase fell within commercial use exemption of TILA was factual issue to be resolved by trier of fact).[8]

## 2.    Billing Error

Section 1666(a) imposes certain obligations on the creditor upon receipt of notice by the obligor that sets forth, among other things, "the obligor's belief that the statement contains a billing error and the amount of such billing error" as well as the reasons for the obligor's belief that the

---

[8]Plaintiff states in his briefs that he purchased the goods from DRMS for personal use in his home for his three children and to refurbish and donate the items to non-profit agencies in his personal name.  *See* Pl.'s Resp. at 1-2; Pl.'s MSJ at 4.  He also asserts that he listed CNSP, Inc., and its shipping address because DRMS would not ship pallets to his place of residence.  *See* Pl.'s MSJ at 2.  Plaintiff, however, did not submit any admissible evidence in support of these factual assertions, and thus, the Court cannot and did not rely on his bare allegations in ruling on Defendant's summary judgment motion.  *See* Fed. R. Civil P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

13

statement contains a billing error.  15 U.S.C. § 1666(a)(2) & (a)(3).  Regulation Z defines a consumer's written notice of billing error as one that "[t]o the extent possible, indicates the consumer's belief and the reasons for the belief that a billing error exists, and the type, date, and amount of the error."  12 C.F.R. § 226.13(b)(3).

Section 1666(b) lists seven definitions of a "billing error."  15 U.S.C. § 1666(b).  Plaintiff asserts that the billing error in this case fits the following definition: "A reflection on a statement of goods or services not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the agreement made at the time of a transaction."  *Id.* § 1666(b)(3).  Regulation Z further elucidates this definition:  "A reflection on or with a periodic statement of an extension of credit for property or services not accepted by the consumer or the consumer's designee, or not delivered to the consumer or the consumer's designee as agreed."  12 C.F.R. § 226.13(a)(3).  The Official Staff Interpretations explain that "Section 226.13(a)(3) covers disputes about goods or services that are 'not accepted' or 'not delivered . . . as agreed,'" and provides examples that include "[t]he appearance on a periodic statement of a purchase, when the consumer refused to take delivery of goods because they did not comply with the contract;" "[d]elivery of property or services different from that agreed upon;" and "[d]elivery of the wrong quantity." 12 C.F.R. part 226.13, Supp. I, Paragraph 13(a)(3).  The Official Staff Interpretations also state, "Section 226.13(a)(3) does not apply to a dispute relating to the quality of property or services that the consumer accepts.  Whether acceptance occurred is determined by state or other applicable law."  *Id.*

The FCBA imposes duties on a creditor once it is properly notified by an obligor of the obligor's belief that a billing error has occurred.  *See* 15 U.S.C. § 1666(a).  Plaintiff has alleged not

14

only that a billing error occurred but that Defendant failed to follow the timing requirements imposed by the FCBA to respond to Plaintiff's notice of error.  That a billing error did not in fact occur does not absolve a creditor of all obligations under the FCBA.  "Section 1666's requirements that a creditor promptly respond to consumer inquiries is triggered upon receipt of a timely notice of 'billing error' regardless of whether the consumer who sent the notice was correct in his belief that an error had been made.  Simply put, the fact that a TILA plaintiff was incorrect in his belief that a billing error had occurred is not a defense to an action under § 1640."  *Belmont*, 119 F.Supp.2d at 159 n.6.  *See also Gengo v. Target Nat'l Bank*, 513 F.Supp.2d 842 (S.D. Tex. 2007) ("The statutory language only requires the consumer to believe that such a billing error has occurred.  The statute does not state that the consumer's assertion of a billing error must be correct in order to trigger the creditor's obligation to respond according to the statutory requirements."); *Eicken v. USAA Federal Savings Bank*, 498 F.Supp.2d 954, 968 & n.8 (S.D. Tex. 2007) (concurring with authorities that have determined that FCBA does not state that consumer's assertion of billing error must be correct to trigger creditor's obligation to respond according to statutory requirements so long as consumer believes there has been a billing error, even if such belief is ultimately shown to be incorrect).  Because the FCBA and Regulation Z contemplate that a consumer may not possess all of the information necessary to precisely identify the extent of a claimed billing error, courts liberally construe what constitutes a belief of a billing error for purposes of determining whether the consumer has provided valid written notice.  *See*, *e.g.*, *Cunningham v. Bank One*, 487 F.Supp.2d 1189, 1192-93 (W.D. Wash. 2007) (concluding that plaintiff's letter stating his belief that statements contained billing errors under § 1666(b)(1)(2) and (5) based on creditor's failure to give proper disclosures constituted valid written notice of billing error).

15

Defendant attempts to limit Plaintiff's dispute as relating solely to the quality of the goods he received.  The problem with this argument is that it ignores language in the notice that indicates that the dispute also concerns goods that were not delivered.  In Plaintiff's March 1, 2006 letter detailing why he was disputing the $5,074 charge, Plaintiff stated that he purchased "computers and computer parts" and that "there were many items missing to include Ram, CD Drives."  Pl.'s MSJ, Ex. 5.  Similarly in Plaintiff's March 26, 2006 letter to Defendant relating to the $4,053.50 charge, Plaintiff offered the following explanation as to why he was disputing that charge: "I purchased 31 dell and micron computers.  I only received 21 dell computers and no micron computers.  After receiving the 21 computers, there were many items missing to include Ram, CD Drives."  *Id.*

Delivery of only 21 of the purchased 31 computers would plainly constitute "[d]elivery of the wrong quantity," which the Official Staff Interpretations list as an example of a billing error.  Additionally, Plaintiff's stated belief in both letters that "items were missing," construed liberally in the consumer's favor, as this Court must, falls within the example of "[d]elivery of property . . . different from that agreed upon."[9]  Plaintiff's notice was thus not merely about the quality of the goods he received; it also asserted that goods were not delivered to Plaintiff as agreed.[10]  Plaintiff's written notice to Defendant thus constituted notice of Plaintiff's "belief that the

---

[9]These facts distinguish this case from *Greisz v. Household Bank (Illinois)*, 8 F.Supp.2d 1031 (N.D. Ill. 1998), a case upon which Defendant relies.  In *Greisz*, the obligor's letter to his creditor merely complained of "unsatisfactory service."  *Id.* at 1042.  The *Greisz* court thus correctly determined that the letter was not proper billing error notice because it fell within the exclusion for a dispute relating to the quality of property or services that the consumer accepts.  *See id.*  In contrast, Plaintiff's letter complains of missing items and computers that were not delivered as agreed.

[10]Other documents in the record clarify that many of the missing items disputed by Plaintiff, such as Ram and CD drives, were parts that should have been included in the "computer" purchase and were not separately purchased items.  While Plaintiff's dispute as to

statement contains a billing error."   The Court therefore cannot grant summary judgment for Defendant on this ground.[11]

### 3.    Forfeiture Amount

Finally, Defendant argues that, even if the FCBA applies and Defendant violated an FCBA requirement, Defendant does not forfeit the entire amount of the disputed charge; rather, the total amount of potential forfeiture here would be $50.   Defendant contends that, because it already provided a $50 credit to Plaintiff's Account in September 2006, Plaintiff's claim is moot.

Section 1666(e) provides a limited forfeiture remedy for noncompliance with the FCBA:

> Any creditor who fails to comply with the requirements of this section or section 1666a of this title forfeits any right to collect from the obligor the amount indicated by the obligor under paragraph (2) of subsection (a) of this section, and any finance charges thereon, except that the amount required to be forfeited under this subsection may not exceed $50.

15 U.S.C. § 1666(e).   Thus, when a creditor violates the FCBA, it only forfeits up to $50 of the amount indicated by the obligor in his written notice.  *See id.*; *Koerner*, 452 U.S. at 237 ("A creditor that fails to comply with [15 U.S.C. § 1666(a)] forfeits its right to collect the first $50 of the disputed amount including finance charges.") (citing 15 U.S.C. § 1666(e)).   Plaintiff here, in two separate written notices, identified two alleged billing errors from two separate statements.   Based on the

---

such "missing items" may be more appropriately deemed a dispute about the quality of the computers rather than a dispute over the failure to deliver the agreed upon items, it was the additional investigation that revealed the full details of the dispute.   The written notice, however, indicates that the alleged billing error was, at least partially, regarding non-delivery of certain goods and thus was sufficient to trigger Defendant's § 1666(a) obligations.

[11]This conclusion does not mean that the Court has determined that a billing error actually occurred; it merely means that Plaintiff's statements in his letters to Defendant conveyed a "belief that the statement contains a billing error" sufficient to trigger Defendant's § 1666 duties to investigate and respond to Plaintiff's inquiry in a timely manner.

language of § 1666(e), if Defendant violated the FCBA procedures as to each disputed charge, Defendant would forfeit $50 for each of the two disputed amounts, for a total forfeiture of $100. Accordingly, even considering only the § 1666(e) remedy, the $50 credit to Plaintiff's Account would not make this case moot.[12]

Moreover, § 1666(e) is not the sole remedy for FCBA violations. *Belmont*, 119 F.Supp.2d at 164. Section 1640 of the TILA applies to a creditor's failure to comply with various provisions of the TILA, including § 1666 of the FCBA. *See Koerner*, 452 U.S. at 239 (noting that 15 U.S.C. § 1640 "provides for the recovery of actual damages sustained by any person as the result of a creditor's failure to comply with various provisions of the TILA, including § 161"); *Gray v. American Exp. Co.*, 743 F.2d 10, 14 (D.C. Cir. 1984) ("[A] card issuer that fails to comply with any requirements of the [FCBA] is liable to the cardholder for actual damages, twice the amount of any finance charge, and costs of the action and attorney's fees."); *Belmont*, 119 F.Supp.2d at 164 (§ 1640(a)(2)(A) provides statutory penalty for violations of §§ 1666 and 1666a).

Section 1640(a) provides that "any creditor who fails to comply with any requirement imposed under this part, including any requirement under . . . part D . . . of this subchapter . . . is liable" for "any actual damage sustained by such person as a result of the failure" or "in the case of an individual action twice the amount of any finance charge in connection with the transaction . . . except that the liability . . . shall not be less than $100 nor greater than $1,000", as

---

[12]It is also unclear whether merely crediting the Account is a binding forgiveness of debt. *See Belmont*, 119 F.Supp.2d at 164 (noting that, because it was unclear whether creditor's letter to purported obligor stating that "nothing is due" constituted binding forgiveness of debt, to avoid issue court would enjoin creditor from collecting first $50 on account).

well as "the costs of the action, together with a reasonable attorney's fee."[13]  15 U.S.C. § 1640(a);

*Gallegos*, 593 F.2d at 376 (explaining that under § 1640(a) "the consumer receives twice the finance

charge (at least $100 but not more than $1,000), costs and attorney's fees").[14]  The Tenth Circuit has

described § 1640(a) as "an automatic civil penalty" that "encourage[s] private enforcement and

remove[s] the need to prove actual damages."  *Gallegos*, 593 F.2d at 376.  A creditor is "relieved

of liability only if he shows 'by a preponderance of the evidence that the violation was not

intentional and resulted from a bona fide error notwithstanding the maintenance of procedures

reasonably adapted to avoid any such error.'"  *Gallegos*, 593 F.2d at 376 (quoting 15 U.S.C.

§ 1640(c)).

Plaintiff has asserted that Defendant violated the FCBA by failing to credit his Account and

by failing to meet the time limits for responding to his written notice of an alleged billing error.

Although Plaintiff has not alleged that he is entitled to any actual damages, if Plaintiff can establish

that Defendant violated the FCBA, he may be entitled to a statutory penalty of twice the amount of

any finance charges, up to $1,000, the costs of the action, and a forfeiture of up to the first $50 of

each disputed charge for which he can show a violation.  *See Garner v. MBNA America Bank, N.A.*,

2006 WL 2354939, *5 & n.8 (N.D. Tex. Aug. 14, 2006) (unpublished opinion) (noting that creditor

who fails to comply with FCBA forfeits any right to collect first $50 of disputed amounts and any

finance charges and is subject to damages under § 1640 of TILA); *Kurz*, 273 F.Supp.2d at 478

---

[13]Section 1666 is found in part D of the relevant subchapter.  *Strange v. Monogram Credit Card Bank of Georgia*, 129 F.3d 943, 946 (7th Cir. 1997) (holding that § 1640 remedies apply to § 1666 violations and that $100 minimum/$1,000 maximum damage award applies to award of twice amount of finance charge contained in § 1640(a)(2)(A)(i)).

[14]A *pro se* plaintiff, however, is not entitled to an attorney's fee under the FCBA.  *See Kurz*, 273 F.Supp.2d at 481.

(explaining that if court finds that defendant violated § 1666(a)(3)(A) and (B) by not replying to obligor's billing error allegations within required period and by not making required corrections, then defendant is liable for statutory damages described in § 1640(a)(2)(A)(i) and § 1666(e)); *Belmont*, 119 F.Supp.2d at 164, 168 (awarding penalty of twice finance charge in maximum statutory amount of $1,000 for creditor's violations of §§ 1666 and 1666a).  For all the foregoing reasons, the fact that Defendant credited Plaintiff's Account with $50.00 does not make this case moot.  Because the Court has rejected each of the arguments made by Defendant in support of its motion, the Court will deny Defendant's motion for summary judgment.

**B.     Plaintiff's Motion for Summary Judgment**

Plaintiff argues that he is entitled to summary judgment because the undisputed facts show that Defendant violated § 1666(a) by failing to timely correct the billing errors arising from the two disputed charges and that Defendant violated § 1666a by unlawfully reporting to three credit agencies the amounts in disputes without notifying Plaintiff of the name and address of the credit agencies.

**1.     Section 1666(a) claim**

As discussed above, questions of fact exist as to the potentially dispositive issue of whether the Account was opened primarily for consumer purposes.  For this reason alone, the Court concludes that Plaintiff is not entitled to summary judgment on his FCBA claims.  In addition, the parties' briefs do not adequately address and support whether or not Defendant met the timing requirements under § 1666(a).

**2.     Section 1666a claim**

Plaintiff asserted for the first time in his motion for summary judgment that Defendant

violated 15 U.S.C. § 1666a(b) by unlawfully reporting to three credit agencies the amounts in dispute without notifying Plaintiff of the name and address of the credit agencies.  Plaintiff's complaint failed to allege any facts that would give notice that he was alleging a claim under section 1666a.  Plaintiff therefore cannot assert a claim under 15 U.S.C. § 1666a based on the complaint currently before the Court.  *See Lawmaster v. Ward*, 125 F.3d 1341, 1346 n.2 (10th Cir. 1997) (refusing to consider claim not raised in complaint).

### 3.	Section 1666i claim

Plaintiff also cites to provisions of 15 U.S.C. § 1666i in his motion for summary judgment. Defendant contends that Plaintiff's complaint does not reference any claim brought pursuant to § 1666i and that, in any event, § 1666i does not apply because the disputed items were purchased more than 100 miles from Plaintiff's address.

Section 1666i(a) provides:

> Subject to the limitation contained in subsection (b) of this section, a card issuer who has issued a credit card to a cardholder pursuant to an open end consumer credit plan shall be subject to all claims (other than tort claims) and defenses arising out of any transaction in which the credit card is used as a method of payment or extension of credit if (1) the obligor has made a good faith attempt to obtain satisfactory resolution of a disagreement or problem relative to the transaction from the person honoring the credit card; (2) the amount of the initial transaction exceeds $50; and (3) the place where the initial transaction occurred was in the same State as the mailing address previously provided by the cardholder or was within 100 miles from such address. . . .

15 U.S.C. § 1666i(a).

In interpreting this provision, Regulation Z states:

> When a person who honors a credit card fails to resolve satisfactorily a dispute as to property . . . purchased with the credit card in a consumer credit transaction, the cardholder may assert against the card issuer all claims (other than tort claims) and defenses arising out of the transaction and relating to the failure to resolve the dispute.  The cardholder may withhold payment up to the amount of credit

21

outstanding for the property . . . that gave rise to the dispute and any finance or other charges imposed on that amount.

12 C.F.R. § 226.12(c)(1).  Section 226.13 governing "billing errors" operates independently of § 226.12(c), such that a cardholder whose asserted billing error involves undelivered goods may institute error resolution procedures under § 226.13, "but whether or not the cardholder has done so, the cardholder may assert claims or defenses under § 226.12(c)."  12 C.F.R. part 226, Supp. I, comment 12(c)(1).  Section 226.12(c) merely preserves the consumer's right to assert against the creditor any claims or defenses that can be asserted against the merchant.  *Id.*, comment 12(c)(2). The determination of what claims or defenses are valid as to the merchant must be made under state law.  *Id.*

Regulation Z also reiterates that this right only applies if "the disputed transaction occurred in the same state as the cardholder's current designated address or, if not within the same state, within 100 miles from that address."  12 C.F.R. § 226.12(c)(3)(ii).  The question of where a transaction occurs "is to be determined under state or other applicable law."   12 C.F.R. part 226, Supp. I, comment 12(c)(3).  The geographical limitation is "intended to limit the liability of merchants to far away customers who might fraudulently chargeback a purchase, secure in the knowledge that the company will not sue because the sum is usually too minor."  *In re Standard Financial Management Corp.*, 94 B.R. 231, 239 (D.Mass. 1988).  *See also Izraelewitz v. Manufacturers Hanover Trust Co.*, 465 N.Y.S.2d 486, 488 (N.Y. City Civ. Ct. 1983) ("The geographical limitation serves to protect banks from consumers who may expose them to unlimited liability through dealings with merchants in far-away states where it is difficult to monitor a merchant's behavior.").

Section 1666i simply allows a credit card holder to bring any state law claim or defense he

may have against the merchant against his creditor.  In this case, Plaintiff did not assert in his complaint what claim or defense against DRMS he was attempting to assert against Citibank.  The Court therefore finds, even after liberally construing the complaint, that Plaintiff has not adequately brought a claim under § 1666i.

Moreover, even if Plaintiff's complaint could be construed as alleging a § 1666i claim against Defendant, Plaintiff cannot recover on such a claim because the place where the initial transaction occurred was more than 100 miles from Plaintiff's designated address in Santa Fe. Under New Mexico law, "[s]ince an acceptance is required to make a binding contract, the geographical place where the acceptance is given will control the location of the formation of the contract." *Orcutt v. S & L Paint Contractors, Ltd.*, 109 N.M. 796, 798, 791 P.2d 71, 73 (Ct. App. 1990).  Bidders make offers when they submit bids. *Planning and Design Solutions v. City of Santa Fe*, 118 N.M. 707, 714, 885 P.2d 628, 635 (1994).  "No contract occurs until acceptance by the party that solicited bids." *Id.*  It is undisputed that Plaintiff bid on the computer goods from his personal home computer in Santa Fe and that DRMS is located in Scottsdale, Arizona.  This Court takes judicial notice that Scottsdale, Arizona, is greater than 100 miles from Santa Fe. *See* Fed. R. Evid. 201 (permitting court to take judicial notice of fact generally known or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned).  When DRMS accepted Plaintiff's bid, the contract was formed, and thus the transaction took place in Arizona. *See Merriman v. Harter*, 59 N.M. 154, 158, 280 P.2d 1045, 1047 (1955) (contract consummated in Oregon where application accepted).  The geographic limitation thus precludes Plaintiff from succeeding on a claim under § 1666i. *Plutchok v. European American Bank*, 540 N.Y.S.2d 135, 137 (N.Y. Dist. Ct. 1989) (transaction occurred outside § 1666i's 100-mile limitation because, under

23

New York state law, transaction was completed when scam merchant in Florida accepted plaintiff's membership offer at time plaintiff gave his credit card number over telephone).

### C.     Defendant's Motion to Amend

Defendant moves for leave to amend its Answer to add counterclaims for breach of the credit card agreement and money lent.  Defendant alleges that in addition to the two disputed charges at issue in Plaintiff's complaint, Plaintiff has also not made payment for other charges on his Account. Defendant requests amendment because "Plaintiff is unwilling to compromise and because his debt owed to Citibank has continued to grow."  Def.'s Mot. to Am. Answer (Doc. 38) at 2.  Defendant seeks the sum of $15,742.68 on the Account, plus interest thereon at the agreed rate of interest from August 31, 2007, until paid in full or date of entry of judgment, late charges, reasonable attorney fees pursuant to the written credit card agreement, and the costs of suit.  *See id.*, Ex. A ("Proposed Counterclaim") at 3.  Plaintiff opposes the motion to amend, arguing that he is not unwilling to compromise and has made reasonable settlement offers to Defendant and that the untimely motion would be prejudicial to him because it was filed almost one year after the filing of the case.

In support of its motion to amend, Defendant relies on Rule 15(a).  When the 20-day time limit for amending an answer as a matter of course has passed, Federal Rule of Civil Procedure 15(a) provides that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  Leave sought must be "freely given" in the absence of any justifiable reason for denial of the motion, such as undue delay, bad faith, repeated failure to cure deficiencies by amendments, undue prejudice, or futility of amendment.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Rule 13(f), however, governs an amendment to add a counterclaim: "When a pleader fails

to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment." Fed. R. Civ. P. 13(f).  It is a matter of the trial court's discretion whether to grant leave to amend under Rule 13(f).  *Federal Deposit Ins. Corp. v. Staudinger*, 797 F.2d 908, 911 (10th Cir. 1986).

In this case, Defendant's stated reasons for failing to allege a counterclaim initially do not amount to oversight, inadvertence, or excusable neglect.  Defendant does not allege that it was not aware of the facts supporting the counterclaim.  Indeed, the record indicates that Defendant was fully aware of the unpaid balance well before Plaintiff filed this suit.  Defendant instead asserts that it is only now moving to add the counterclaim because the debt has continued to grow and Plaintiff has been unwilling to settle this case.  These reasons do not amount to excusable neglect.

Even more concerning is Defendant's utter failure to explain why it failed to move to amend its answer prior to the Court's June 11, 2007 deadline for filing pretrial motions.  On January 30, 2007, the Court entered a Scheduling Order setting June 11, 2007 as the filing and service deadline for all pretrial motions.  Scheduling Order (Doc. 8) at 1.  Defendant was plainly aware of this deadline, as evidenced by the fact that Defendant objected to Plaintiff's request to file his motion for summary judgment one week after the June 11, 2007 deadline.  As Defendant noted in its objection to Plaintiff's motion for extension of time to file his motion, "The Scheduling Order instructs that case management deadlines shall not be modified, 'except by an order of the Court upon a showing of good cause.'"  Def.'s Opp. to Pl.'s Mot. for Extension of Time to file Mot. for Summ. J. (Doc. 28) at 1.  Despite Defendant's awareness of the deadline, it did not timely file its motion to amend nor request leave of the Court to file the motion late.  Although Defendant mentioned in the proposed pretrial order that it intended to file the motion, Defendant waited more

25

than a month after filing the proposed pretrial order before filing its motion to amend.  The result of the delay is that Defendant filed its motion to add a counterclaim almost 11 months after the case was removed, nearly four months after the deadline to file pretrial motions had passed, and over five months after the deadline for discovery.  The Court finds that the untimeliness of the motion amounts to undue delay and weighs in favor of denying the amendment.  *See Staudinger*, 797 F.2d at 911 (affirming trial court's denial of motion to add counterclaim because motion occurred sixteen months after defendant became aware of underlying facts giving rise to claim).

Moreover, the Court is not convinced that Plaintiff will not suffer prejudice from the delay.  Although Defendant asserts, without support, that further discovery on the counterclaim will not be necessary, it also alleges that Plaintiff is delinquent on his Account obligations, including the two disputed charges implicated in Plaintiff's complaint as well as "for other charges."  Def.'s Mot. to Am. Answer, ¶ 5.  Plaintiff responds that he can neither affirm nor deny the purported total amount owed on the Account because he has not received a statement since January of 2007.  It thus is not clear at this point whether or not Plaintiff will need further discovery should the amendment be permitted.

In short, Defendant has not met its burden to demonstrate why the amendment should be allowed.  Defendant's asserted reasons for the delay do not meet either the excusable neglect standard under Rule 13(f) or the good cause standard under Rule 16(b) needed to modify a scheduling order.  *See* Fed. R. Civ. P. 16(b) ("A schedule shall not be modified except upon a showing of good cause and by leave of the . . . judge.").  The undue delay and potential prejudice also weigh in favor of denial of the motion to amend.  Nor has Defendant shown that justice requires the amendment.  The Court will therefore deny Defendant's Motion to Amend the Answer.

**IT IS THEREFORE ORDERED** that

1.      The "Motion of Defendant Citibank (South Dakota), N.A., Erroneously Identified as 'Citi Cards/Bank', for Summary Judgment" (Doc. 13) is **DENIED**;

2.      Plaintiff's Motion for Summary Judgment (Doc. 19) is **DENIED**; and

3.      Defendant's Motion to Amend Answer (Doc. 38) is **DENIED**.

**SENIOR UNITED STATES DISTRICT JUDGE**